United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:
Clover Technologies, Inc.,                                                    Case No. 03-45110-R
                Debtor.                                         Chapter 7
_____/

Stuart A. Gold, Trustee,
                Plaintiff,

v.                                                                          Adv. No. 04-4741

Ameritech Acquisition Corp. and SBC
Communications, Inc.,
                Defendant.
_____/

Opinion Regarding Cross-Motions for Summary Judgment

I.

The debtor, Clover Technologies, was previously owned by defendant Ameritech CT Acquisition Corp. Ameritech is owned by defendant SBC Communications. On September 22, 2000, Ameritech offered to sell all of the stock of the debtor for $5,000,000. On October 14, 2000, Global View Technology entered into a stock purchase agreement with Ameritech. GVT formed Global View Acquisition to acquire the stock of the debtor. Because GVT and GVA had insufficient assets to purchase the stock, GVA caused the debtor to enter into an account receivable factoring agreement with Greenfield Commercial Credit, an accounts receivable factoring company. At the December 20, 2000, closing Greenfield purchased $7,841,404.31 of the debtor's receivables to fund the purchase. The $5,000,000 purchase price was wired to SBC's bank account. Ameritech transferred the debtor's stock to GVA. As

a result, GVA became the 100% owner of the debtor.

At the time of the transfer, the debtor had a cash balance of $493,674.89 in its Comerica bank account. These funds were withdrawn shortly after the transfer on January 10, 2001.

An involuntary petition was filed against the debtor on February 24, 2003. On August 10, 2004, the trustee filed this adversary proceeding against Ameritech and SBC alleging (1) unauthorized distribution to shareholders; (2) fraudulent transfer under § 544(b) and MCL § 566.34(1)(b)(i) & (ii), and MCL § 566.35(1) and (3) claim disallowance.

The Court dismissed the claim for unauthorized distribution on January 26, 2005, in response to a motion to dismiss filed by the defendants. The Court held that the transaction was not a distribution, but rather a sale of stock. (See January 26, 2005 Opinion at 3.)

II.

The trustee seeks partial summary judgment on the following issues: a) that SBC is the "initial transferee" and Ameritech is the "party for whose benefit" the transfers were made, within the meaning of § 550(a)(1) & (2); and b) that the debtor received less than reasonably equivalent value from the defendants in exchange for the fraudulent transfers.

The trustee contends that the proceeds from the sale of the debtor's receivables were wired directly to SBC's Chase account in order to pay the purchase price for Ameritech's capital stock in the debtor. The trustee asserts that the $5 million wired from Greenfield to SBC constituted proceeds from the debtor's receivables. The trustee further argues that $493,674.89 in cash from the debtor's Comerica account was transferred to SBC. The trustee contends that Ameritech, as the owner of the debtor's stock and as a

party to the Stock Purchase Agreement, was the entity for whose benefit the transfer was made.

The trustee asserts that there are no genuine issues of material fact that the debtor received less than reasonably equivalent value from the defendants in exchange for the transfer. The trustee argues that the debtor received no value in exchange for the transfers.

On the other hand, the defendants contend that the trustee's fraudulent transfer claims fail as a matter of law because the defendants did not receive any of the debtor's property as a result of the transaction. The defendants rely on this Court's prior opinion on the defendants' motion to dismiss in which the Court stated that "[t]he money received by Ameritech did not come from Clover, it came from the sale of the debtor's stock to GVA." (See Opinion at 3.)

The defendants further contend that the trustee's claim to avoid the $493,674.89 transfer was not in the trustee's original complaint and the defendants assert that they have objected to the trustee's amended complaint.

The defendants assert that the transaction was not a leveraged buyout because in order to qualify as an LBO all or substantially all of the debtor's assets had to be encumbered as a result of the transaction. However, the defendants contend, the lien granted to Greenfield only had a value of $8.5 million whereas the debtor had assets valued at $43 million. Even if the transaction did qualify as an LBO, the defendants argue that the Court cannot collapse the transaction between the debtor, GVT and Greenfield in order to create the legal fiction that the defendants were transferees of the debtor's property. The defendants contend that in order to collapse the transaction, it must be shown that the defendants caused or had knowledge of the existence of all of the transactions which form the basis of the LBO. The defendants contend that they did not know that the debtor's receivables were going to be factored to obtain financing

for the transaction.

The defendants assert that the trustee's constructive fraud claims must fail as well. The defendants argue that the debtor received significant value as a result of the transaction because the debtor and its new parent company, GVT, received $3 million in cash as well as the benefit of qualification as a minority business enterprise and establishment as an independent, privately owned corporation.

The defendants also argue that the debtor was not insolvent at the time of the transaction and did not become insolvent as a result thereof. The defendants assert that the debtor's balance sheets reflect assets of $43 million at the time of the transaction and total liabilities of $12.7 million. Further, the defendants note that the debtor's bankruptcy did not occur until 2 years after the transaction.

The defendants therefore argue that the Court should deny the trustee's motion for summary judgment as to the issue of transferee status under § 550(a) and as to the issue of whether the debtor received reasonably equivalent value.

In support of their motion for summary judgment, the defendants assert that they had no knowledge of the source of funding for the purchase. They assert that the Stock Purchase Agreement merely required GVT to secure financing, it did not require GVT to disclose the source or nature of that financing. The defendants provided the affidavit of David Morgan, the President of Ameritech at the time of the transaction. Morgan confirms that the defendants did not know or have reason to know the means by which GVT obtained financing to purchase the debtor. The defendants further assert that even if they had been aware of the factoring agreement, they had no reason to believe that it was a fraudulent transfer.

In opposition to the defendants' motion for summary judgment, the trustee argues that the defendants misconstrue the Court's decision on the motion to dismiss. The trustee contends that the Court

4

did not hold that the $5 million paid to SBC for the debtor's receivables was not property of the estate, the Court merely held that the money came from the sale of the debtor's stock as opposed to a distribution in respect of Ameritech's stock in the debtor. The trustee contends that the $5 million constitutes factoring proceeds of the debtor's own receivables and as such was the debtor's property.

The trustee further contends that the transaction was a leveraged buyout. The trustee contends that all of the debtor's assets were encumbered as part of the LBO because the debtor granted Greenfield a security interest in all of its assets and eventually surrendered all of its assets to Greenfield.

The trustee also argues that he is not required to collapse the transaction in order to prevail. However, if necessary, the transaction can be collapsed because the defendants knew about the LBO features of the financing. The trustee asserts that there is nothing in the statute that renders the defendants' knowledge of leveraged financing a prerequisite to a finding that a fraudulent transfer occurred. In any event, the trustee contends that the defendants did have such knowledge. The trustee contends that during an interview of David Morgan on September 16, 2005, Morgan stated that he knew that GVT was having difficulty obtaining financing for the purchase of the debtor's stock and that GVT had been turned down by GE Capital. Morgan also stated that he knew that any financing obtained to fund the purchase would have to be secured by the debtor's assets. The trustee contends that this interview of David Morgan was conducted before he had counsel and is inconsistent with his affidavit. The trustee further contends that the deposition testimony of Hiram Jackson confirms that before the LBO was consummated the defendants knew of the LBO features of the transaction. Moreover, the trustee contends that based on the funding source alone, that being an "alternative lender" as opposed to a bank or finance company, the defendants knew or should have known that the debtor's assets would be encumbered in order to finance the purchase

5

of the debtor's stock.

The trustee asserts that even if the defendants lacked actual knowledge of the financing, under the facts of this case they had constructive knowledge of the LBO aspects of the deal. The trustee contends that the defendants had intimate knowledge of the debtor's operational loss, declining revenues, and high employee turnover, and thus were well aware that the debtor would need financing in order to fund its working capital needs. However, the trustee asserts that the defendants either chose not to investigate GVT or ignored what they saw. The trustee contends that the defendants had a duty to investigate GVT to make sure that it had adequate financial backing to support the debtor.

The trustee disputes the defendants assertion that the debtor received reasonably equivalent value in exchange for the transfer. The trustee contends that the debtor did not receive any value in exchange for the transfer. The trustee asserts that the debtor sold $11.9 million of its receivables in order for Greenfield to fund $7.8 million, $5 million of which was wired to SBC. The trustee further contends that the defendants' argument that the debtor received intangible benefits is ludicrous. The trustee contends that the LBO cut off the debtor's financial lifeblood - SBC. The trustee argues that any benefit the debtor received from its affiliation with GVT was far outweighed by the devastating effect of severing the debtor's ties with the defendants.

The trustee disputes the defendants' argument that the debtor was solvent at the time of the transfer. The trustee argues that there is a presumption of insolvency when a debtor is not paying its debts as they become due. This, the trustee asserts, was the case with the debtor. The trustee contends that it is undisputed that immediately after the LBO the debtor was unable to pay its debts as they became due.

### III. *Whether SBC is the Initial Transferee and Ameritech the Party for Whose Benefit the Transfer was Made under 11 U.S.C. § 550(a)(1)*

11 U.S.C. § 550(a)(1) provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

11 U.S.C. § 550(a)(1).

The proceeds from the sale of the debtor's receivables were wired to SBC's Chase account to pay the purchase price for Ameritech's stock in the debtor. The debtor's stock was then transferred to GVA.

The defendants rely on the Court's prior opinion in support of their contention that they did not receive any property from the debtor and therefore cannot be considered transferees. In that opinion, the Court dismissed the claim for unauthorized distribution to shareholders. The Court noted that:

MCL § 450.1106(4) defines "distribution" as follows:

> "Distribution" means a direct or indirect transfer of money or other property, except the corporation's shares, or the incurrence of indebtedness by the corporation to or for the benefit of its shareholders in respect to the corporation's shares. A distribution may be in the form of a dividend, a purchase, redemption or other acquisition of shares, an issuance of indebtedness, or any other declaration or payment to or for the benefit of the shareholders.

7

MCL § 450.1106(4).

The Court then held:

> Although the trustee and the defendants seem to agree that the transfer was a distribution as to Ameritech, the Court concludes that it was not. This was a sale of assets. Clover did not make a distribution to Ameritech; Ameritech sold its interest in Clover. The money received by Ameritech did not come from Clover, it came from the sale of the debtor's stock to GVA. "The transaction was nothing more and nothing less than a purchase and sale of [Clover's] stock." *Pittsburgh Tube Co. v. Tri-Bend, Inc.*, 463 N.W.2d 161, 165 (Mich. App. 1990). Accordingly, the trustee's claim for unauthorized distribution to shareholders must be dismissed.

(See Opinion at 3-4.)

The Court rejects the defendants' argument. The Court did not hold that there was not a transfer of the debtor's interest in property. The Court held that there was not a distribution, i.e. "a direct or indirect transfer of money or other property, except the corporation's shares, or the incurrence of indebtedness by the corporation to or for the benefit of its shareholders in respect to the corporation's shares."

The defendants also argue that in order for the Court to find that the defendants were transferees of the debtor's property, the Court must conclude that the transaction constituted an LBO, which, the defendants assert, it did not.

Leveraged buyouts have been described as follows:

> An LBO is a purchase transaction based on pledging the assets of the purchased entity to secure the purchase price. Typically, a small group of investors and managers combine to purchase the outstanding shares of a

8

company by creating a large debt by . . . obtaining a loan from a financial institution. Almost no equity capital is invested. The debt, to repeat, is secured by pledging the assets of the acquired company as security.

*Kupetz v. Wolf*, 845 F.2d 842, 845-46 (9th Cir. 1988).

Similarly, in *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991), *cert. denied*, 503 U.S. 937, 112 S. Ct. 1476 (1992), the court stated:

> Although the formal structure of LBOs may differ, the substance of LBOs follow a general pattern. A leveraged buyout refers to the acquisition of a company ("target corporation") in which a substantial portion of the purchase price paid for the stock of a target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquiror invests little or no equity. Thus, a fundamental feature of leveraged buyouts is that equity is exchanged for debt.
>
> * * * *
>
> The effect of an LBO is that a corporation's shareholders are replaced by secured creditors. Put simply, stockholders' equity is supplanted by corporate debt. The level of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio. This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of bankruptcy. The lender, which normally assumes a senior, secured position vis-a-vis other creditors, is at risk only to the extent that the loan is under-collateralized. An LBO may be attractive to the buyer, seller, and lender because the structure of the transaction could allow all parties to the buyout to shift most of the risk of loss to other creditors of the corporation if the provisions of section 548(a)(2) were not applied.
>
> The selling shareholders receive direct benefit in the LBO transaction as they are cashed out, usually at a price above the price the shares were trading shortly before the acquisition is announced. The new purchaser also benefits from the transaction by thereby achieving ownership of the corporation. The lender is attracted by the higher interest rates and fees usually associated with LBOs. The target corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation. As legal scholars have noted, the target firm may

> not at all reflect the Elizabethan deadbeat, but may in fact wind up as the sacrificial lamb. Wahl & Wahl, *Fraudulent Conveyance Law and Leveraged Buyouts*, 16 William Mitchell L. Rev. 343, 353 (1990).

*Id.* at 645-46.

The defendants contend that the transaction cannot be characterized as an LBO because the factoring agreement did not encumber "all" or "substantially all" of the debtor's assets, as courts have required for a sale to be considered an LBO for fraudulent conveyance purposes. However, the debtor granted Greenfield a security interest in all of its assets. In any event, the defendants have provided no direct support for their argument that all assets must be encumbered in order for the Court to find an LBO. In *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992), the court analyzed the transaction as an LBO although the value of the collateral was $26.2 - 27.2 million and the debt secured was only $15.5 million. *Id.* at 1060. The court noted that the hallmark of an LBO is the exchange of equity for debt. *Id.* at 1059.

The cases cited by the defendants do state that all or substantially all of the assets were encumbered. However, they were simply reciting the facts of those cases, not making a statement of the law. Accordingly, the defendants' argument that the transaction cannot be classified as an LBO because all or substantially all of the assets were not encumbered is rejected.

The defendants also argue that the Court cannot collapse the transaction and find that the defendants received a transfer of the debtor's property because the defendants had no knowledge that the transaction was being financed with the debtor's receivables. However, it is not necessary for the Court to collapse the transaction in order to find that the defendants were transferees of the debtor's property. Accordingly,

the Court concludes that the defendants were transferees of $5,000,000 of the debtor's property

The trustee also seeks a ruling that SBC was the transferee of the balance in the debtor's Comerica account. As noted by the trustee, at the December 20, 2000, closing the debtor assigned its Comerica bank account to Ameritech. The account had a balance of $493,674.89, which was withdrawn on January 10, 2001. The defendants' response is that the trustee failed to plead the existence of these funds in his original complaint and, although the trustee has since amended his complaint, the defendants assert that they intend to object to the amendment. No objection has been filed. Assuming the trustee has properly stated a claim for avoidance of the $493,674.89 transfer, the Court concludes that the defendants were the transferees of those funds.

### IV. *Whether the Debtor Received Reasonably Equivalent Value*

Whether "reasonably equivalent value" was received in a transaction is a question of fact. *Heritage Bank Tinley Park v. Steinberg* (*In re Grabill Corp.*), 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990). Moreover, the determination of reasonably equivalent value depends on all the circumstances surrounding the transaction. *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 466 (S.D.N.Y. 2001).

The Court concludes that there are genuine issues of material fact regarding whether the debtor received reasonably equivalent value.

### V. *Whether the Debtor was Solvent at the Time of the Sale and Did Not Become Insolvent as a Result of the Sale*

The defendants seek summary judgment on this issue. Michigan employs a "balance sheet" test to

determine whether a debtor is solvent. Thus, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation." MCL § 566.32(1). However, there is a presumption of insolvency if the debtor is not paying his debts as they become due. MCL § 566.32(2).

The defendants contend that the debtor was solvent and remained solvent after the sale because after the sale the debtor had assets valued at more that $30 million in excess of its liabilities. The trustee argues that immediately following the sale, the debtor was unable to pay its debts as they became due, creating a presumption of insolvency. Trustee also argues that the debtor's assets must be valued based on "fair valuation," as provided by the statute, not simply what is reported on the debtor's balance sheet.

The Court concludes that there are genuine issues of material fact as to the debtor's solvency. The defendants' motion for summary judgment is therefore denied on this issue.

VI.

For the foregoing reasons, the defendants' motion for summary judgment and the trustee's motion for summary judgment as to whether the debtor received reasonably equivalent value are denied. The trustee's motion for summary judgment as to whether the defendants were transferees of the debtor's property is granted.

Not for Publication

**Entered: January 24, 2006**

                                                             **/s/ Steven Rhodes**
                                                            **Steven Rhodes**
                                                           **Chief Bankruptcy Judge**